UNITED STATES BANKRUPTCY COURT                    NOT FOR PUBLICATION
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
In re:                                           Chapter 11

MARKETXT HOLDINGS CORP.,                         Case No. 04-12078 (ALG)


                              Debtor.
-----------------------------------------------------------------x
E*TRADE FINANCIAL CORP.,

            Plaintiff and Counterclaim Defendant,

            - against -

MARKETXT HOLDINGS CORP. and                      Adv. Proc. No. 05-01082 (ALG)
MKXT, LLC,

            Defendants and Counterclaim Plaintiffs,

OFFICIAL COMMITTEE OF UNSECURED
CREDITORS,

            Intervenor-Defendant and Counterclaim
            Plaintiff.
-----------------------------------------------------------------x

### MEMORANDUM OF OPINION ON MOTION AND CROSS-MOTION TO DISMISS

A P P E A R A N C E S:

MAYER, BROWN, ROWE & MAW LLP
Attorneys for E*Trade Financial Corp., Plaintiffs and Counterclaim Defendants
1909 K Street, N.W.
Washington, DC 20006
        By: Richard J. Morvillo, Esq.
            Jeffrey F. Robertson, Esq.
1675 Broadway
New York, New York 10019
        By: Anthony J. Diana, Esq.

BRAUNER BARON ROSENZWEIG & KLEIN, LLP
Attorneys for Alan Nisselson, Chapter 11 Trustee, Defendant and Counterclaim Plaintiff
61 Broadway, 18th Floor
New York, New York 10006
        By: Mel P. Barkan, Esq.
            Alan Nisselson, Esq.

KAYE SCHOLER LLP
Attorneys for the Official Committee of Unsecured Creditors, Intervenor-Defendant and
Counterclaim Plaintiff
425 Park Avenue
New York, New York 10022
        By: Steven J. Glassman, Esq.
            Lester M. Kirshenbaum, Esq.
            Robert B. Bernstein, Esq.

**ALLAN L. GROPPER**
**UNITED STATES BANKRUPTCY JUDGE**

This litigation involves the 2002 acquisition by E*Trade Financial Corp. ("E*Trade") of several subsidiaries of MarketXT Holdings Corp. ("Holdings" or the "Debtor"). E*Trade is reputedly one of the largest and most successful electronic securities trading firms. Holdings is now in Chapter 11 proceedings before this Court. Both parties charge in substance that the other defrauded it and breached the acquisition agreement that documented the acquisition.

Holdings has moved to dismiss the following claims raised in the Amended Complaint: (i) violations of Exchange Act § 10(b) and Rule 10b-5 thereunder (Count I); and (ii) common law fraud and deceit (Count II). The claims in the complaint relating to breach of the acquisition agreement are not subject to the Debtor's motion to dismiss, and it is not certain whether granting Holdings' motion would make a significant difference in the case, since the only funds available to pay a judgment in favor of E*Trade may be those that were included in a huge contractual escrow that was created in connection with

the acquisition agreement.[1]  In any event, Holdings has also counterclaimed against E*Trade, asserting that it was E*Trade that was guilty of fraud and breach of the acquisition agreement.[2]   The Debtor's position, as formulated by its Chapter 11 trustee, is that E*Trade, in an increasingly dominant position, failed to disclose certain key facts, prevented Holdings from entering into an alternative transaction that would have benefited all of its stakeholders, and at closing had no intention whatsoever to permit Holdings' principals to achieve the earnings targets and access an "earn-out" that comprised a significant portion of the purchase price.  In the motions before the Court for decision, E*Trade has moved to dismiss the following claims raised in the counterclaims: (i) fraud in the sale of securities (first cause of action); (ii) common law fraud (second cause of action); (iii) conversion (eighth cause of action); and (iv) prayer for relief for punitive damages.[3]

The complaint and the counterclaims both contain detailed allegations of deceitful conduct.  At this stage of the case, only the allegations of the complaint and

---

[1] The following claims raised in the Amended Complaint are not subject to the motion to dismiss: (i) breach of contract-Merger Agreement (Count III); (ii) breach of contract-Standstill Agreement (Count IV); (iii) conversion (Count V); (iv) unjust enrichment (Count VI); (v) breach of contract (Count VII); (vi) breach of contract-Merger Agreement and Escrow Agreement (Scheduled Claims) (Count VIII); (vii) breach of contract-Merger Agreement and Escrow Agreement (Section 9.2(a)(i) and 9.2(a)(ii) Claims) (Count IX); (viii) declaratory relief-Merger Agreement and Escrow Fund (Scheduled Claims) (Count X); (ix) declaratory relief-Merger Agreement and Escrow Fund (Section 9.2(a)(i) and 9.2(a)(ii) Claims) (Count XI); (x) declaratory relief (Count XII); and (xi) attorneys' fees (Count XIII).  The Complaint also names as an additional defendant an entity known as MKXT LLC.  MKXT LLC had no independent business of its own and was apparently intended at one time to become the successor in interest to Holdings.  It was a defendant in an adversary proceeding in the Holdings' main case that sought to substantively consolidate MKXT LLC and Holdings.  The Court signed an order on June 22, 2005 that substantively consolidated MKXT LLC with Holdings.  E*Trade admits that it has sued MKXT LLC as a successor in interest to Holdings solely out of an abundance of caution (Amended Complaint, ¶ 13), and MKXT LLC will be treated as if it were part of Holdings for all purposes herein.
[2] The Debtor's creditors committee has intervened on its side in the dispute.
[3] The following claims raised in the Counterclaims are not subject to the motion to dismiss: (i) breach of contract (earn-out) (third cause of action); (ii) breach of contract (registration statement) (fourth cause of action); (iii) breach of contract (September 13, 2002 Agreement) (fifth cause of action); (iv) breach of covenant of good faith and fair dealing by E*Trade (sixth cause of action); (v) interference with contractual relations and prospective economic advantage (seventh cause of action); and (vi) promissory estoppel (ninth cause of action).

counterclaims are at issue, and there has been no proof of either fraud or breach of contract.  It remains to be determined whether either party can sustain its allegations.  If only some of the allegations prove out, the real question in this litigation may be which of the parties was guilty of worse conduct and what (if any) legal implications flow therefrom.  Nevertheless, none of this is germane to the issues on these motions.  The motions must be decided by reference to specific principles that govern the pleading of fraud and related claims, and they are disposed of as follows.

## BACKGROUND

The following factual allegations in the Amended Complaint and the Counterclaims are assumed to be true for purposes of the motion to dismiss and cross-motion to dismiss.

### Sale of the Tradescape Entities

Holdings, formerly known as Tradescape Corp., T Corp. and Tradescape.com, Inc., was a privately-held holding company that provided services to professional, proprietary and retail securities traders.  (Amended Complaint, ¶¶ 1, 12.)  Holdings had two wholly-owned subsidiaries, Momentum Securities, LLC ("Momentum"), and MarketXT Corp., referred to herein as MarketXT, Inc. (Amended Complaint, ¶ 27.) Momentum was reported to be the fifth largest electronic brokerage firm in the United States, with over 20 branch offices nationwide, providing high-speed direct-access trading technology to retail customers (commonly known as day traders) and responsible for approximately 8% of the NASDAQ's daily volume.  MarketXT, Inc. was an electronics communications network that effected securities trades.  It allegedly engaged in business deals with Momentum that were purportedly arms-length in nature, but in fact

it is alleged that the profits of Momentum, which were upstreamed to Holdings,

subsidized the money-losing operations of MarketXT, Inc. through inter-company

transfers. (Counterclaims, ¶ 2; Amended Complaint, ¶¶ 27-28.) Holdings also owned all

of the issued and outstanding Class A limited liability company interests of certain other

subsidiaries, including Tradescape Technology MarketXT, Inc., Tradescape

Technologies, LLC, Tradescape Momentum Holdings, Inc., Tradescape Securities, LLC,

and Momentum Securities Partners, LLC. The subsidiaries of Holdings, including

Momentum, but excluding MarketXT, Inc., are hereafter called, collectively, the

"Tradescape Entities." (Amended Complaint, ¶ 12; Counterclaims, ¶ 1.)[5]

The Debtor's Counterclaims allege that in late 2000 and 2001, stock prices of

many of the companies in the technology and electronic brokerage field severely

declined. (Counterclaims, ¶ 9.) The September 11, 2001 terrorist attacks on the World

Trade Center further disrupted and adversely affected many brokerage businesses,

including those owned by Holdings, which had offices in and around the vicinity of the

World Trade Center. (Counterclaims, ¶ 9.) Experiencing liquidity problems and a

deteriorating financial situation, Holdings determined to sell certain of its subsidiaries to

an appropriate purchaser. (Counterclaims, ¶ 9.)

Initially, Holdings negotiated with, and received an offer from, Ameritrade, Inc.,

for the sale of its subsidiaries. (Counterclaims, ¶ 10.) In November 2001, Holdings

opened up the sale process by announcing an auction and obtaining proposals from

several potential acquirers. (Counterclaims, ¶ 10.) According to the Counterclaims,

---

[4] Unless otherwise specified, the term Tradescape Entities means: Tradescape Technology MarketXT, Inc.;
Tradescape Technologies, LLC; Tradescape Momentum Holdings, Inc.; Momentum Securities, LLC;
Tradescape Securities, LLC; and Momentum Securities Partners, LLC.

[5] MarketXT, Inc. is also a debtor in proceedings before this Court. It appears to be largely defunct except
that it apparently still collects on certain software licensing fees. (Amended Complaint, ¶ 1, n.1.)

some of these potential acquirers offered to provide Holdings with immediate liquidity by offering to purchase the Tradescape Entities outright, with no earn-out provision, but the offers limited Holdings' ability to share in any future growth of the Tradescape Entities' businesses.  (Counterclaims, ¶ 11.)  Other potential acquirers were willing to provide Holdings an opportunity to share in the future growth of the Tradescape Entities' businesses but did not provide Holdings with immediate liquidity.  (Counterclaims, ¶ 11.)  E*Trade learned about the auction in December 2001 and expressed an interest in participating.  (Counterclaims, ¶ 12.) Holdings eventually agreed to meet and negotiate a deal with E*Trade.  (Counterclaims, ¶ 12.)

On April 10, 2002, E*Trade and Holdings signed an Agreement and Plan of Merger (the "Merger Agreement"), pursuant to which Holdings sold the Tradescape Entities to E*Trade in exchange for approximately 11,750,052 shares of restricted E*Trade stock, valued at $280 million, $180 million of which was to be paid as part of an earn-out if Momentum's revenues hit certain target levels by December 31, 2002 and December 31, 2003, respectively.  (Amended Complaint, ¶ 187.)  The transaction closed on June 3, 2002.

Both parties are now alleging, *inter alia*, claims sounding in fraud and breach of contract in connection with this transaction.

**E*Trade's Allegations of Fraud**

E*Trade alleges that Holdings engaged in a scheme to defraud E*Trade regarding the financial condition of the Tradescape Entities.  (Amended Complaint, ¶ 1.)  The Amended Complaint alleges that Omar Amanat ("Amanat"),[6] Sharif Amanat[7] and Daniel

---

[6] Amanat was the founder, CEO and member of the board of directors of Holdings.  According to the Amended Complaint, Amanat also served as Momentum's CEO in the months preceding the sale of the

Ryan ("Ryan"),[8] as Holdings' officers, directors, and control persons, intentionally conspired to misrepresent the revenues, assets and liabilities of the Tradescape Entities, thereby inducing E*Trade to purchase the Tradescape Entities at a price far exceeding their fair value.  (Amended Complaint, ¶ 1.)  E*Trade's allegations in support of its fraud causes of action fall into three broad categories: (i) alleged fraudulent financial statements provided in connection with E*Trade's due diligence for the acquisition; (ii) alleged misrepresentations made by Holdings outside the documents referenced in the Merger Agreement; and (iii) alleged fraudulent conduct in connection with a later standstill agreement dated September 13, 2002 (the "Standstill Agreement").

E*Trade makes the following allegations that fraudulent financial statements were provided to E*Trade during due diligence: (i) the January and February 2002 financial statements for Momentum were materially misleading; (ii) to hide allegedly deteriorating financial conditions, Holdings did not accrue liabilities on Momentum's books and failed to pay its vendors and lawyers; (iii) Holdings fraudulently manipulated and made false representations in the financial statements of Momentum and Holdings; (iv) to mask Momentum's deteriorating business the financial statements falsely reported illusory "rebates" from MarketXT, Inc. to Momentum; (v) Holdings' financial statements did not

---

Tradescape Entities and was and currently is a principal stockholder of Holdings.  (Amended Complaint, ¶ 14.)  The Amended Complaint further alleges that during the relevant times, Amanat was the primary decision-maker and controlled the day-to-day operations and policies of the Tradescape Entities. (Amended Complaint, ¶ 14.)

[7] Sharif Amanat, the father of Amanat, was the Chairman of Holdings' board of directors and the single largest stockholder of Holdings.  (Amended Complaint, ¶ 15.)  Engaged by Holdings as a consultant, Sharif Amanat was allegedly involved in the day-to-day operations and decision-making of the company and its subsidiaries.  (Amended Complaint, ¶ 15.)  He was also involved in the merger discussions regarding the Tradescape Entities and was in regular contact with Amanat throughout the discussions. (Amended Complaint, ¶ 15.)

[8] Ryan was the Chief Administrative Officer and Executive Vice President of Holdings.  The Amended Complaint alleges that Ryan also served as Momentum's CFO from late 2001 onward, that he was involved in Momentum's day-to-day operations, that he controlled, in conjunction with others, the policies and decision-making of the Tradescape Entities, and that he owned up to 1% of Holdings' stock with options to purchase at least 50,000 additional shares.  (Amended Complaint, ¶ 16.)

disclose liabilities concerning bonuses and employment agreements; and (vi) the representations in the Merger Agreement pertaining to the financial statements were false and misleading. (Amended Complaint, ¶¶ 81-225.)

As one of the many specific allegations set forth, the Amended Complaint alleges that Holdings failed to relate the concerns expressed by Holdings' accountants, Ernst & Young, about Momentum's 2000 and 2001 financial statements. (Amended Complaint, ¶ 120.) Specifically, Ernst & Young relayed concerns about (i) related party transactions that were not disclosed in Momentum's stand-alone financial statements for the years ended 1999, 2000 and 2001; (ii) $3 million in unrecorded oral commitments that existed as of December 31, 2001, which allegedly reflected bonuses used "to retain the trading groups as customers of [Momentum];" and (iii) an unrecorded $450,000 bonus owing to the Chimera trading group. (Amended Complaint, ¶ 121.) Had these and the disclosures discussed above been made, the transaction would have closed on different terms, if at all. (Amended Complaint, ¶ 291.)

E*Trade further alleges that in order to mask Momentum's deteriorating business, Holdings used MarketXT, Inc. to offer artificially high rebates to Momentum. (Amended Complaint, ¶ 130.) In late 2001 and into 2002, electronic communication networks such as MarketXT, Inc. competed for active trading volume from day-traders by offering "rebates" to broker/dealers and traders. (Amended Complaint, ¶ 130.) The "rebate" scheme alleged in the Amended Complaint assertedly worked in the following manner: MarketXT, Inc., at Amanat's direction, offered rebates of $4.00 per 1,000 shares traded to its broker/dealer Momentum, a figure that was much higher than the industry norm. (Amended Complaint, ¶ 130.) Momentum, in turn would give the traders $3.30 of $4.00.

8

(Amended Complaint, ¶ 137.)  The rebate trading had two effects.  First, it induced

traders to use Momentum as a medium through which to engage in an artificially high

volume of shares at a very low commission rate.  (Amended Complaint, ¶ 135.)  Second,

although rebates should have had little impact on Momentum's bottom line if recorded

correctly in the financial documents, it is asserted that Momentum accounted for

approximately $5 million of accounts receivable but failed to disclose the approximately

$4 million in offsetting accounts payable.  (Amended Complaint, ¶¶ 137-138.) E*Trade

alleges that had these effects of the rebate scheme been disclosed, it would not have

closed the transaction or would have offered a significantly lower purchase price.

(Amended Complaint, ¶ 147.)

        With respect to alleged misrepresentations outside the 113 representations in the

Merger Agreement, E*Trade asserts that Holdings misrepresented that Momentum was a

profitable, ongoing concern, that its business model was based on commission revenue

and profits from proprietary trading, that Momentum's revenues remained steady, even as

the rest of the industry was declining, and that Holdings would keep its promise to pay

certain liabilities listed in the Merger Agreement and could indemnify E*Trade in the

event such liabilities were unpaid.  (Amended Complaint, ¶ 80.)  In addition, Holdings

allegedly misrepresented that (i) Momentum was a broker/dealer in good capital standing

(Amended Complaint, ¶ 148-150); (ii) that the Tradescape Entities were the "crown-

jewel" of the direct access and electronic brokerage industry and that Momentum,

MarketXT, Inc. and other affiliates of Holdings operated as "stand alone entities"

(Amended Complaint, ¶ 161-164); (iii) that Momentum was a "cost leader with a

profitable business model today with recurring revenues and built-in growth," that

Momentum had "zero material legal or regulatory issues;" that for the first quarter 2002,

pretax income should be $26.2 million (Amended Complaint, ¶ 169-174); and (iv) that

Momentum had $500 million in revenue with $150 million in operating income

(Amended Complaint, ¶ 175).  E*Trade alleges that these misrepresentations provided a

misleading picture of financial soundness and caused E*Trade to close the transaction on

terms materially different from those to which it otherwise would have agreed.

(Amended Complaint, ¶ 186, 284.)

E*Trade further asserts that Amanat and Holdings fraudulently induced it to sign

a Standstill Agreement. (Amended Complaint, ¶ 264, 289.) The Standstill Agreement set

forth, among other things, certain arrangements relating to disputes that had arisen

between the parties following the closing of the Merger Agreement.  The Standstill

Agreement permitted E*Trade to recoup at least $7 million to cover various expenses it

was forced to incur as a result of the transaction, and pursuant to the Standstill

Agreement, Holdings allegedly agreed that part of the initial consideration paid to

Holdings in the merger, approximately 2.35 million shares of E*Trade stock, would be

sold with the proceeds delivered to E*Trade.  (Amended Complaint, ¶ 264.)  The

Amended Complaint alleges that Amanat has refused to honor Holdings' obligations

under the Standstill Agreement, and specifically, has failed to execute the appropriate

documentation to enable E*Trade to collect the $7 million in proceeds from the sale of

the E*Trade shares.  (Amended Complaint, ¶ 265.)

**Holdings' Allegations of Fraud**

Holdings, in turn, alleges that E*Trade fraudulently induced it to sell the

Tradescape Entities to E*Trade for E*Trade stock valued at $280 million, with more than

half of the value part of an earn-out over an eighteen-month period.  (Counterclaims, ¶ 3.)

Holdings contends that while negotiating the sale of the Tradescape Entities, E*Trade

representatives made numerous false statements that induced Holdings to sell the

Tradescape Entities in exchange for E*Trade stock rather than accept other offers that

would have provided immediate cash.  (Counterclaims, ¶ 13.)  Holdings alleges that

E*Trade's misrepresentations relate to the following general categories: (i) the value of

E*Trade stock; (ii) the business strategy of E*Trade; (iii) E*Trade's willingness to allow

Momentum to earn additional consideration in the form of E*Trade stock after the

merger through the earn-out; and (iv) the post-merger role of Holdings' CEO.

(Counterclaims, ¶ 14.)

The Value of E*Trade Stock: The Counterclaims allege that on December 26,

2001, E*Trade submitted a written proposal to acquire the Tradescape Entities for

approximately $250 to $350 million.  (Counterclaims, ¶ 15.)  At the time, E*Trade stated

that it wanted to close the deal quickly and represented that E*Trade "had the most

attractive currency" among the potential acquirers because its stock was undervalued and

likely to increase in price in the coming year.  (Counterclaims, ¶ 15.) Jarrett Lilien and

other E*Trade executives represented to Holdings, in March 2002, that E*Trade shares

would trade at $12 per share by September and $20 per share by December 2002, despite

the fact that the shares were trading at approximately $9.50 per share at the time of the

representation.  (Counterclaims, ¶ 16.)  In a March 2002 meeting at E*Trade's

headquarters, Mitchell Caplan of E*Trade allegedly represented to Amanat, Ryan and

others that E*Trade would report earnings of $1 per share by the end of 2002.

(Counterclaims, ¶ 17.)

The Business Strategy of E*Trade: The Counterclaims allege that prior to the merger, between December 2001 and April 2002, E*Trade repeatedly represented to Holdings that it was in the process of "rolling up" the active trading industry by buying up small brokerage firms that specialized in providing access to traders and that it would continue to consolidate the active trading industry after buying the Tradescape Entities. (Counterclaims, ¶ 18.)  In addition to those oral representations, E*Trade also included its plan to "roll up" the active trading industry as a part of an E*Trade board presentation before the sale of the Tradescape Entities.  (Counterclaims, ¶ 18.)

The E*Trade's Willingness and Intent to Pay an Earn-Out of Additional E*Trade Stock after the Merger: Sections 1.4(c) and 12.1 of the Merger Agreement provided for an earn-out of additional E*Trade stock then valued at $180 million.  (Counterclaims, ¶ 42.)  Sections 1.18 and 12.1 of the Merger Agreement provided that Holdings was entitled to the earn-out if the Tradescape Entities reached revenue targets of $30 million during the period from July 1, 2002 through December 31, 2002, and $60 million during the 2003 calendar year.  (Counterclaims, ¶ 43.)  Holdings alleges that E*Trade failed to disclose that it never intended to pay the earn-out and instead intended to frustrate the ability of Holdings to achieve it.  (Counterclaims, ¶ 53.)  The Counterclaims allege that indicative of its true intent, E*Trade announced immediately after entering into the Merger Agreement that it had purchased the Tradescape Entities for a purchase price of $100 million, and that any obligation to pay an earn-out was based on aggressive earnings targets.  (Counterclaims, ¶ 53.)

The Post-Merger Role of Holdings' CEO: The Counterclaims allege that post-merger, Amanat should have had "full operational control over the Momentum business,

as well as additional necessary resources and capital, and [should have] eventually run E*Trade's entire retail brokerage business." (Counterclaims, ¶ 13(d).)  In support of this proposition, the Counterclaims allege that at a meeting in December 2001 between Amanat, Sohail Khalid of Holdings, Scott Appleby, an advisor to Holdings, and the president of E*Trade, Jerry Gramaglia, Gramaglia represented that if a deal were consummated, Amanat could continue to operate the Tradescape Entities' business and be an integral part of E*Trade management.  (Counterclaims, ¶ 14.)  Amanat, however, was terminated a few weeks after the transaction closed.  (Counterclaims, ¶ 13(d).) Holdings claims that, absent the aforementioned statements, it would not have sold the Tradescape Entities to E*Trade.  (Counterclaims, ¶ 24.)

The Cotsakos Compensation: The Counterclaims allege that on April 20, 2002, three weeks after Holdings had executed the Merger Agreement, E*Trade publicly announced that its 2001 financials had failed to disclose Cotsakos' nearly $90 million compensation, a disclosure asserted as significant in light of the E*Trade's approximate $241 million loss in 2001.  (Counterclaims, ¶ 26.)  Holdings alleges that the public disclosure of Cotsakos' compensation caused the price of E*Trade shares to decline dramatically and the value of the consideration received for the Tradescape Entities to plummet.[9]  (Counterclaims, ¶ 29.)  Holdings alleges that in the wake of the disclosure

---

[9] Holdings' consideration for the sale of the Tradescape Entities was determined in the following manner. Pursuant to §§ 1.4(c) and 12.1 of the Merger Agreement, Holdings was to receive an amount of shares equal to $100 million divided by the average pre-closing price of E*Trade stock in a ten-day period, and an earn-out of additional E*Trade shares equal to $180 million divided by the same average pre-closing price of E*Trade stock.  If the pre-closing price of E*Trade stock did not provide $100 million in initial consideration and $180 million for the earn-out, E*Trade would have to provide additional shares to Holdings to maintain the value of the consideration.  The Merger Agreement, however, also provided that if the average pre-closing price of E*Trade stock was equal or less than a "Collar Price" of $8.5106, then the average pre-closing price was limited to the Collar Price.  (Counterclaims, ¶ 30.)  When the pre-closing price of E*Trade shares fell below the Collar Price, allegedly as a result of E*Trade's various disclosures,

regarding Cotsakos' compensation as well as other negative disclosures, the price of E*Trade shares fell from $9.05 on April 10 to $7.50 on April 30, $6.12 on May 10 and $6.04 per share on June 3, 2002, when the Merger Agreement closed. (Counterclaims, ¶ 31.) Later, the price of E*Trade shares declined as low as $2.80 per share before Cotsakos was forced to resign from E*Trade in January 2003. (Counterclaims, ¶ 33.)

Losses of over $270 Million in the First Quarter of 2002: Holdings alleges that shortly after E*Trade's disclosure of Cotsakos' compensation, E*Trade announced, and Holdings learned for the first time, that E*Trade had losses of over $270 million in the first quarter of 2002. (Counterclaims, ¶ 27.) Holdings alleges that the public disclosure of these losses contributed to the decline in the price of the E*Trade shares and a decrease in the value of the consideration Holdings received for the sale of the Tradescape Entities. (Counterclaims, ¶ 29.)

The Counterclaims allege that had Holdings known the truth of the matter prior to the signing of the Merger Agreement, it would not have executed the Merger Agreement or would have demanded and obtained different terms, including the elimination of the "collar" and the payment of additional shares of E*Trade stock. (Counterclaims, ¶ 34.) Holdings claims that notwithstanding the disclosures regarding Cotsakos' compensation after the signing of the Merger Agreement on April 10, 2002, and even though it knew of the subsequent decline in the price of E*Trade stock, it was effectively forced to close the transaction on June 3, 2002. (Counterclaims, ¶ 36.) The Counterclaims allege that E*Trade knew that Holdings was experiencing financial difficulties and liquidity problems, and that Holdings had by then lost the opportunity to sell to others and needed

---

Holdings lost at least $30 million in value for the initial consideration and $54 million in value for the earn-out. (Counterclaims, ¶ 32.)

to close. (Counterclaims, ¶ 36.)  Holdings alleges that E*Trade took advantage of its

financial problems and pressured Holdings to close the deal.  (Counterclaims, ¶ 37.)

Holdings cites an incident, by way of example, that occurred during the auction process,

in which Charles Schwab & Co. submitted an all-stock offer to acquire the Tradescape

Entities, subject to completing due diligence, for $200 million upfront and no earn-out.

(Counterclaims, ¶ 37.)  Schwab requested that Holdings delay the sale to E*Trade so that

it could conduct due diligence.  (Counterclaims, ¶ 37.)  Upon being approached by

Holdings with a request to extend the auction period, E*Trade refused and allegedly

began to exert pressure on Holdings to execute the papers immediately.  (Counterclaims,

¶ 37.)

**Holdings' Allegations of Conversion**

Holdings alleges that E*Trade exercised dominion and control over, and

improperly denied Holdings the use of, various items of hardware, software and

equipment, of which Holdings was the legal owner, that were housed in a data center to

be shared with E*Trade after the merger.  (Counterclaims, ¶ 117.)  The Counterclaims

further allege that E*Trade similarly denied Holdings the use of its electronic files,

emails, financial data, privileged documents and proprietary intellectual property records

and unlawfully removed certain property owned by Holdings from a shared storage

warehouse. (Counterclaims, ¶¶ 118, 119.)

**The Bankruptcy**

On March 26, 2004, an involuntary case was commenced against Holdings under

Chapter 7 of the Bankruptcy Code.  Eventually, Holdings filed a motion to convert the

involuntary case to a voluntary case under Chapter 11, and an order granting the motion

was entered on December 2, 2004.  On December 16, 2004, the United States Trustee

appointed a Creditors Committee, and a Chapter 11 Trustee was appointed thereafter.

This adversary proceeding was commenced on January 24, 2005 and an amended

complaint was filed on May 26, 2006.  Holdings filed its counterclaims on October 7,

2005 and subsequently filed amended counterclaims on June 9, 2006. [10]

## DISCUSSION

Motions to dismiss are governed by Fed. R. Civ. P. 12(b)(6), made applicable by

Bankruptcy Rule 7012(b).[11]  A motion to dismiss is "designed to test the legal sufficiency

of the complaint, and thus does not require the Court to examine the evidence at issue."

*DeJesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 69 (2d Cir. 1996), *cert. denied*, 519 U.S.

1007 (1996); see also *Granite Partners, L.P. v. Bear, Stearns & Co., Inc.*, 58 F.Supp.2d

228, 236 (S.D.N.Y. 1999), citing *Ryder Energy Distribution Corp. v. Merrill Lynch*

*Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir. 1984), *aff'd*, 865 F.2d 492 (2d Cir. 1989).

On a Rule 12(b)(6) motion, consideration is limited to the factual allegations in the

complaint, including documents attached to the complaint as exhibits or incorporated by

reference, matters of which judicial notice may be taken under Fed. R. Evid. 201 and

documents on which the plaintiff relied in bringing suit.[12]  *Granite Partners, L.P.* 58

---

[10] Both parties have agreed that the amendments to the Complaint and Counterclaims would not affect a
decision on motion or cross-motion, even though the changes were made after the motion and cross-motion
to dismiss had been briefed and argued before the Court.

[11] Holdings initially answered the Complaint and has brought its cross-motion to dismiss pursuant to Fed.
R. Civ. P. 12(c), which provides for judgment on the pleadings.  In deciding a Rule 12(c) motion, courts
"apply the same standard as that applicable to a motion under Rule 12(b)(6), accepting the allegations
contained in the complaint as true and drawing all reasonable inferences in favor of the nonmoving party."
*D'Alessio v. New York Stock Exch., Inc.*, 258 F.3d 93, 99 (2d Cir. 2001), *cert. denied*, 534 U.S. 1066
(2001).

[12] A court can take judicial notice of complaints and related filings to establish the fact of litigation and of
contents of public documents filed with the SEC as facts "capable of accurate and ready determination by
resort to sources whose accuracy cannot reasonably be questioned."  *Kramer v. Time Warner, Inc.*, 937
F.2d 767, 774 (2d Cir. 1991), citing Fed. R. Evid. 201(b)(2); *see also Cortec Indus. v. Sum Holding L.P.*,

F.Supp.2d at 236, citing *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993);
*see also Kramer*, 937 F.2d at 773.  A court may dismiss the complaint only if "it appears
beyond doubt that the plaintiff can prove no set of facts in support of his claim which
would entitle him to relief."  *D'Alessio*, 258 F.3d at 99, citing *Burnette v. Carothers,* 192
F.3d 52, 56 (2d Cir.1999), *cert. denied,* 531 U.S. 1052 (2000).

Fed. R. Civ. P. 8(a)(2) requires that a complaint contain a "short and plain
statement of the claim showing that the pleader is entitled to relief."  Pursuant to the
liberal pleading standards of Rule 8, "a plaintiff must disclose sufficient information to
permit the defendant 'to have a fair understanding of what the plaintiff is complaining
about and to know whether there is a legal basis for recovery.'"  *Kittay v. Kornstein*, 230
F.3d 531, 541 (2d Cir. 2000), quoting *Ricciuti v. New York City Transit Auth.*, 941 F.2d
119, 123 (2d Cir. 1991).  A complaint alleging securities fraud or common law fraud
must also satisfy the heightened pleading requirements of Rule 9(b) of the Federal Rules
of Civil Procedure.  *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 168 (2d Cir. 2000);
*Chill v. General Elec. Co.*, 101 F.3d 263, 267 (2d Cir. 1996); *Granite Partners, L.P. v.
Bear, Stearns & Co., Inc.*, 58 F. Supp. 2d 228, 257 (S.D.N.Y. 1999). Rule 9(b) requires
that "in all allegations of fraud, the circumstances constituting the fraud must be stated
with particularity."  *Id*. at 236, citing *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124,
1127 (2d Cir. 1994).  The pleadings must adequately specify the statements that were
false or misleading, give particulars as to the alleged falsity of the statements, and state
the time and place the statements were made and the identity of the persons who made
them.  *Id*. at 236; *McLaughlin v. Anderson*, 962 F.2d 187, 191 (2d Cir. 1992).  Ordinarily,

---

949 F.2d 42, 27 (2d Cir. 1991), *cert. denied*, *Cortec Indus. v. Westinghouse Credit Corp.*, 503 U.S. 960
(1992).

pleadings of fraud cannot be based on information and belief, except where the facts are

peculiarly within the opposing party's knowledge, and even then, "the allegations must

be accompanied by a statement of facts upon which the belief is founded." *Granite

Partners, L.P.*, 58 F. Supp. 2d at 258-59, citing *Stern v. Leucadia Nat'l Corp.*, 844 F.2d

997, 1003 (2d Cir. 1988), *cert. denied*, 488 U.S. 852 (1988).

## I. Fraud Claims

Both E*Trade and Holdings have asserted claims for relief sounding in securities

law and common law fraud and have challenged the legal sufficiency of the other's

claims.  The principles that govern securities law fraud are derived from § 10(b) of the

Securities and Exchange Act of 1934 and Rule 10b-5 thereunder.  Section 10(b) of the

Securities and Exchange Act bars conduct "involving manipulation or deception,

manipulation being practices ... that are intended to mislead investors by artificially

affecting market activity, and deception being misrepresentation, or nondisclosure

intended to deceive." *Ganino*, 228 F.3d at 161, citing *Field v. Trump*, 850 F.2d 938, 946-

47 (2d Cir. 1988), *cert. denied*, 489 U.S. 1012 (1989).  Rule 10b-5 provides that

> It shall be unlawful for any person, directly or indirectly, by the use of any
> means or instrumentality of interstate commerce, or of the mails of any
> facility of any national securities exchange, (a) To employ any device,
> scheme, or artifice to defraud, (b) To make any untrue statement of a
> material fact or to omit to state a material fact necessary in order to make
> the statements made, in the light of the circumstances under which they
> were made, not misleading, or (c) To engage in any act, practice, or course
> of business which operates or would operate as a fraud or deceit upon any
> person, in connection with the purchase or sale of any security.

The purpose of § 10(b) and Rule 10b-5 is to "protect persons who are deceived in

securities transactions—to make sure that buyers of securities get what they think they

are getting and that sellers of securities are not tricked into parting with something for a

price known to the buyer not to be what it purports to be." *Chem. Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 943 (2d Cir. 1984), *cert. denied*, 469 U.S. 884 (1984).

To state a claim under § 10(b) and Rule 10b-5, a plaintiff must plead that "the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." *Ganino*, 228 F.3d at 161; *In re Carter-Wallace, Inc. Sec. Litig.*, 150 F.3d 153, 155-56 (2d Cir. 1998), *aff'd, Honeyman v. Hoyt (In re Carter-Wallace Sec. Litig.)*, 220 F.3d 36 (2d Cir. 2000); *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808 (2d Cir. 1996); *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir. 1995); *Brown v. E.F. Hutton Group, Inc.*, 991 F.2d 1020, 1031 (2d Cir. 1993); *Luce v. Edelstein*, 802 F.2d 49, 55 (2d Cir.1986), citing *Ernst & Ernst v. Hochfelder,* 425 U.S. 185 (1976). A sixth element is that the misrepresentation must have been "furthered by defendant's use of the mails or any facility of a national securities exchange." *Citibank N.A. v. K-H Corp.*, 968 F.2d 1489, 1494 (2d Cir. 1992); *Royal A. Managers, Inc. v. IRC Holding Corp.*, 885 F.2d 1011, 1015 (2d Cir. 1989).

Similarly, under New York law, to satisfy the elements for a fraud cause of action, there must be "a representation of fact, which is either untrue and known to be untrue or recklessly made, and which is offered to deceive the other party and to induce them to act upon it, causing injury." *Citibank, N.A.*, 968 F.2d at 1496, citing *Jo Ann Homes at Bellmore, Inc. v. Dworetz*, 25 N.Y.2d 112, 119, 250 N.E.2d 214, 217, 302 N.Y.S.2d 799, 803 (1969). The five basic elements necessary to sustain a claim of fraud under New York law are (i) misrepresentation of a material fact, (ii) the falsity of that

misrepresentation, (iii) scienter, or intent to defraud, (iv) reasonable reliance on that representation; and (v) damage caused by such reliance. *May Dep't Stores Co. v. Int'l Leasing Corp.*, 1 F.3d 138, 141 (2d Cir. 1993); *Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966, 970-71 (2d Cir. 1987); *Granite Partners, L.P.*, 58 F. Supp. 2d at 257. In addition, where an omission rather than a misrepresentation is alleged, the plaintiff must demonstrate that the defendant had a duty to disclose. *Manela v. Garantia Banking Ltd.*, 5 F.Supp.2d 165, 178, n.118 (S.D.N.Y. 1998), citing *Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.*, 68 F.3d 1478, 1483 (2d Cir. 1995); *In re New York Trap Rock Corp.*, 42 F.3d 747, 754 (2d Cir. 1994); *Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional de Venezuela*, 991 F.2d 42, 47 (2d Cir. 1993); see also *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1542 (2d Cir. 1997), *cert. denied*, 522 U.S. 864, 118 S. Ct. 169, 139 L.Ed.2d 112 (1997) ("[f]raud by affirmative misrepresentation, or actual fraud, and fraud by omission, or fraudulent concealment, are different causes of action and demand different elements of proof under New York law") (citations omitted).

The elements of common law fraud are "largely the same as those of a Rule 10b-5 claim except there is no 'in connection with' requirement," and in the case of affirmative face-to-face misrepresentations, there is no "use of the mails or any facility of a national securities exchange" requirement. *Manela*, 5 F. Supp. 2d at 178-79; *Super Bowl Corp. Ltd. v. Drexel Burnham Lambert Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 151 B.R. 49, 59 (S.D.N.Y. 1993); *see also The Pits, Ltd. v. Am. Express Bank Int'l*, 911 F. Supp. 710, 719 (S.D.N.Y. 1996). E*Trade and Holdings correctly treat the two causes of action as generally co-extensive, with certain exceptions.

### A. The Sufficiency of E*Trade's Fraud Causes of Actions

There is no dispute that E*Trade has sufficiently alleged materiality and falsity of

the claimed misrepresentations and omissions, as well as the elements of scienter, injury,

"in connection with" and "use of the mails or any facility of a national securities

exchange."  Holdings asserts, however, that with respect to both securities law fraud and

common law fraud E*Trade has not adequately plead the reliance element.

### 1. Reliance

There is no real question that E*Trade has sufficiently alleged that it relied on the

misrepresentations and omissions allegedly made by Holdings in the context of the

Merger Agreement.  The real issue is whether an integration clause in the Merger

Agreement precludes E*Trade from seeking damages in connection with oral

representations allegedly made by Holdings that were not specifically included as part of

the Agreement.  Section 13.2 of the Merger Agreement contains the integration clause at

issue here.  It provides:

> "This Agreement and the agreements expressly referred to or
> contemplated herein set forth the entire understanding of the parties hereto
> with respect to the transactions contemplated hereby, and, except as set
> forth in this Agreement, such other agreements, and the Exhibits hereto,
> there are no representations or warranties, express or implied, made by
> any party to this Agreement (of any of their Affiliates) with respect to the
> subject matter of this Agreement.  Any and all previous agreements and
> understandings between or among the parties regarding the subject matter
> hereof, whether written or oral, are superseded by this Agreement and the
> agreements referred to or contemplated herein."

(Merger Agreement § 13.2.)

The basic rule under New York law with respect to the effect of a merger clause is

that "a general merger clause is ineffective to exclude parol evidence to show fraud in

inducing the contract," or stated differently, "where the complaint states a cause of action

for fraud, the parol evidence rule is not a bar to showing the fraud – either in the inducement or in the execution – despite an omnibus statement that the written instrument embodies the whole agreement, or that no representations have been made." *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 320, 157 N.E.2d 597, 598-99, 184 N.Y.S.2d 599, 601-602 (1959) (cases cited); *see, e.g.*, *Sabo v. Delman*, 3 N.Y.2d 155, 160-61, 143 N.E.2d 906, 908-09, 164 N.Y.S.2d 714, 717-18 (1957) (general merger clause, providing "No verbal understanding or conditions, not herein specified, shall be binding on either party" was ineffectual to exclude evidence of fraudulent representations); *Bridger v. Goldsmith*, 143 N.Y. 424, 426-27, 38 N.E. 458 (1894).

This general rule is conditioned by the further principle that where a party "specifically disclaims reliance upon a particular representation in a contract, that party cannot, in a subsequent action for common law fraud, claim it was fraudulently induced to enter into the contract by the very representation it has disclaimed reliance upon." *Harsco Corp. v. Segui*, 91 F.3d 337, 345 (2d Cir. 1996); *Dimon Inc. v. Folium, Inc.*, 48 F. Supp. 2d 359, 367 (S.D.N.Y. 1999); *see also Brown*, 991 F.2d at 1033 (applying the same rule in the securities fraud context).  In *Harsco,* 91 F.3d at 345, the Court found that sections 2.05 and 7.02 of an agreement precluded the plaintiff from establishing reasonable reliance on alleged misrepresentations.  The Court in *Harsco* dismissed the fraud claim because the parties were sophisticated and "the exhaustive nature of the Section 2.04 representations add[ed] to the specificity of Section 2.05's disclaimer of other representations."  *Id*. at 345. [13]

---

[13] Furthermore, courts have held that sophisticated parties who rely on a general merger clause can still be precluded from alleging reliance on fraudulent statements made prior to the signing.  In *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189 (2d Cir. 2003), the plaintiff alleged that during the negotiations leading up to its investment in the preferred stock of defendant, defendant's offers

Notwithstanding what has come to be known as the *Danaan-Harsco* doctrine, sophisticated parties who have received extensive representations and warranties in an agreement containing a general merger clause or have executed a specific disclaimer can state a fraud claim relating to representations outside the agreement if they can prove the applicability of the "peculiar knowledge" exception. Such exception provides that "'even where the parties have executed a specific disclaimer of reliance on a seller's representation, a purchaser may not be precluded from claiming reliance on any ... misrepresentations if the facts allegedly misrepresented are peculiarly within the seller's knowledge ... .'" *Dimon Inc.*, 48 F.Supp.2d at 368, citing *Tahini Invs., Ltd. v. Bobrowsky*, 99 A.D.2d 489, 470 N.Y.S.2d 431, 433 (2d Dep't 1984). The exception finds its theoretical basis in the premise that when "matters are ... peculiarly within the defendant's knowledge ... plaintiff may rely without prosecuting an investigation, as he has no independent means of ascertaining the truth." *Id*. at 368 (citations omitted). The inquiry as to whether the defendant had peculiar knowledge of the facts at issue goes to the reasonableness of the plaintiff's reliance in that "if the plaintiff has the means of learning the facts *and* disclaims reliance on the defendant's representations, there simply is no reason to relieve it of the consequences of both its failure to protect itself and its bargain to absolve the defendant of responsibility. On the other hand, if the plaintiff has conducted the appropriate due diligence and reasonably believes that it has corroborated

---

misrepresented the size of the company's largest asset, its investment in another company. The stock purchase agreement had a standard, general merger clause, stating that the agreement, together with the accompanying documents "'contain[ed] the entire understanding and agreement among the parties ... and supersede[d] any prior understandings or agreements between or among them.'" *Id*. at 193. The Second Circuit found that in light of the defendant's extensive contractual representations about other matters, the plaintiff's sophistication, and the size of the transaction, plaintiff's failure to protect itself by insisting that the representation be included in the stock purchase agreement precluded as a matter of law a finding of reasonable reliance upon defendant's misrepresentation as to that investment. *Id*.

the defendant's representations, then a different result may be warranted." *Id*. at 368
(internal citations omitted).

New York cases recognize that the peculiar knowledge exception applies "not
only where the facts allegedly misrepresented literally were within the exclusive
knowledge of the defendant, but also where the truth theoretically might have been
discovered, though only with extraordinary effort or great difficulty." *Dimon Inc.*, 48
F.Supp.2d at 368; *see, e.g.*, *Tahini Invs., Ltd.*, 99 A.D.2d 489, 470 N.Y.S.2d 431 (reliance
arguably justified where plaintiff had no practical way of knowing that purchased land
had been used as industrial waste dump); *Todd v. Pearl Woods, Inc.*, 20 A.D.2d 911, 248
N.Y.S.2d 975, 977 (2d Dep't 1964), *aff'd*, 15 N.Y.2d 817, 257 N.Y.S.2d 937, 205 N.E.2d
861 (1965) (facts held peculiarly within defendant's knowledge even though discoverable
by review of public records).   Factors relevant in determining whether a party may use
the peculiar knowledge exception are the buyer's (i) level of sophistication and (ii) access
to the information underlying the alleged misrepresentation.   *Dimon Inc.*, 48 F. Supp. 2d
at 368, citing *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729 (2d Cir.
1984).   In general, the "more sophisticated the buyer, the less accessible must be the
information to be considered within the seller's peculiar knowledge." *Dimon*, 48 F.
Supp. 2d at 369, n.55.

Application of these principles to the facts at hand, as alleged in the E*Trade
Complaint, results in the following conclusions.   Whether the integration clause in the
Merger Agreement is deemed specific or general, it falls within the *Danaan-Harsco*
doctrine.   If the integration clause is deemed specific, and it appears to be as specific as
the merger clause in *Dimon*, then E*Trade would *prima facie* be precluded from relying

on any representations not made in the Merger Agreement.  Even if the integration clause is deemed a general clause, it would still fall within the purview of *Harsco* and *Emergent*, because the 113 separate representations and warranties as well as 30 separate covenants and schedules that E*Trade obtained from Holdings demonstrates that E*Trade was, *prima facie*, sufficiently sophisticated and capable to protect itself against fraud by demanding that Holdings make further representations.  Thus, under any reading of the integration clause, unless E*Trade has adequately pleaded that the facts allegedly misrepresented were within the "peculiar knowledge" of Holdings or could have been discovered only with extraordinary difficulty, it would not have been reasonable for E*Trade to rely on any representations Holdings made that were not included as representations set forth in the Merger Agreement itself.

Although E*Trade is a sophisticated party that obtained multiple representations and warranties as well as multiple covenants and schedules from Holdings, E*Trade has adequately alleged that Holdings made additional misrepresentations based on the premise that Holdings hid material facts that could not have been discovered without extraordinary effort and extreme difficulty.  Based on the pleadings, this is a case where the alleged fraud "was hidden in its accounting records, requiring extraordinary effort and sophisticated consultants to unmask."  *See Dyncorp v. GTE Corp.*, 215 F. Supp. 2d 308, 322-23 (S.D.N.Y. 2002).  Under the circumstances, E*Trade has sufficiently pleaded the reliance element.

### 2. Whether E*Trade's Common Law Fraud Claim is Duplicative of its Breach of Contract Claims

Even though a fraud claim may be pleaded sufficiently, when it is "'premised upon an alleged breach of contractual duties and the supporting allegations do not

concern representations which are collateral or extraneous to the terms of the parties'

agreement, a cause of action sounding in fraud does not lie.'" *Bridgestone/Firestone,*

*Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996), citing *McKernin v.*

*Fanny Farmer Candy Shops, Inc.*, 176 A.D.2d 233, 234, 574 N.Y.S.2d 58, 59 (2d Dep't

1991); see also *Papa's-June Music, Inc. v. McLean*, 921 F. Supp. 1154, 1162 (S.D.N.Y.

1996); *Metro. Transp. Auth. v. Triumph Adver. Prods.*, 116 A.D.2d 526, 527, 497

N.Y.S.2d 673, 675 (1st Dep't 1986).  To maintain a claim of common law fraud in such a

situation, a plaintiff must either (i) demonstrate a legal duty separate from the duty to

perform under the contract; (ii) demonstrate a fraudulent misrepresentation collateral or

extraneous to the contract; or (iii) seek special damages that are caused by the

misrepresentation and not recoverable as contract damages. *Bridgestone/Firestone, Inc.*,

98 F.3d at 20.

There is no question that E*Trade's Amended Complaint does not satisfy the third

of the *Bridgestone/Firestone* factors; no special damages are claimed.  The question is

whether it satisfies either of the first two *Bridgestone/Firestone* factors. *See also TVT*

*Records v. The Island Def Jam Music Group*, 412 F.3d 82, 91 (2d Cir. 2005), *cert.*

*denied*, 126 S. Ct. 2968 (2006).

As Holdings asserts, it had a contractual relationship with E*Trade.  Moreover,

the parties also included both an exclusive remedy clause and an extensive

indemnification provision, pursuant to which any breach of the representations and

warranties in the Merger Agreement on the part of Holdings would only be subject to

claims for indemnity and the terms of a specially designated escrow fund.  The exclusive

remedy clause, §9.7, provided that "Except as provided in Section 7.2(e), the parties

hereto agree that the remedies provided by this Article IX shall be the sole and exclusive remedy of [E*Trade] following the Closing for the subject matter covered by such indemnification and any claim arising under this Agreement." (See Merger Agreement, §§ 9.2(a), 1.11, 9.3.) The indemnification provisions are included in §§ 9.2 and 9.3 and are broad, and in an escrow provision, § 1.11, the parties set aside 2.4 million shares of E*Trade stock, a very substantial portion of the total consideration, to protect E*Trade from Holdings.

In response, E*Trade relies on *Tomoka Re Holdings, Inc. v. Loughlin*, 2004 WL 1118178, at *5 (S.D.N.Y. 2004), for the proposition that that under New York law, "a party may not insulate itself contractually from liability for fraud or gross negligence." (citing New York cases).  The Court in *Tomoka* held, in relevant part, that an indemnification provision found in a stock purchase agreement was not sufficient to preclude those of plaintiffs' claims that went beyond the indemnification clause, because the indemnification provision applied to only one defendant and did not apply to claims based on a reinsurance agreement.  *Id*. at 5.  Arguing that the indemnification provision here cannot shield Holdings from liability, E*Trade relies on the proposition that

> New York law recognizes an independent duty in three types of contractual situations: 'first, where the party has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth; second, when the parties stand in a fiduciary or confidential relationship with each other; and third, where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge.'

*Id*. at 4, quoting *Brass*, 987 F.2d at 150.  E*Trade argues that, under *Tomoka*, Holdings had a duty independent of its duty to perform under the contract because (1) Holdings made partial or incomplete statements about the Tradescape Entities' financial condition

27

in the false financial statements provided to E*Trade and had a duty to provide the whole truth; and (2) Holdings had superior knowledge of the Tradescape Entities' financial condition, which was not readily available to E*Trade, and (3) Holdings knew that E*Trade was acting on the basis of mistaken knowledge regarding its subsidiaries' financial condition.

*Tomoka* also makes clear that the general rule is to enforce limitation of remedy clauses, and that a plaintiff has a heavy burden to prove that a defendant's conduct falls within the exception and amounts, in effect, to grossly negligent conduct or intentional wrongdoing.  2004 WL 1118178, at *6.  Similarly, in *Dyncorp*, 215 F. Supp. 2d at 322-23, the Court found that no separate duty was owed where a seller of a business represented and warranted the accuracy of its financial statements, and the purchaser disclaimed reliance on any representation not in the agreement, limited its remedies to indemnity claims up to a certain amount, and agreed that indemnification would be its sole and exclusive remedy.  Section 9.2(a) of the Merger Agreement gave E*Trade the right to be indemnified for losses arising out of any breach of Holdings' representations and warranties in the Agreement, and § 9.7 further provided that this was the exclusive remedy "for the subject matter covered by such indemnification and for any claim arising under [the Merger] Agreement."

Nevertheless, as discussed above, E*Trade's fraud claims have been sustained because the fraud alleged against Holdings concerned matters that went beyond the specific representations in the Merger Agreement.  E*Trade's fraud claims thus may be said to fall within the second exception to the *Bridgestone/Firestone* doctrine, where the fraud alleged is deemed collateral to the contract.  It is established law that a "valid fraud

claim may be premised on misrepresentations that were made before the formation of the

contract and that induced the plaintiff to enter the contract."  *Cohen v. Koenig*, 25 F.3d

1168, 1173 (2d Cir. 1994) (holding that fraud claim was not duplicative of contract claim

because fraud was extraneous to the contract); *see also Deerfield Communications Corp.*

*v. Chesebrough-Ponds, Inc.*, 68 N.Y.2d 954, 956, 510 N.Y.S.2d 88, 89, 502 N.E.2d 1003,

1004 (1986) (holding that the claim for fraud in the inducement was "a representation of

present fact, not of future intent ... collateral to, but which was the inducement for the

contract, and thus was neither duplicative of the [contract claim] ... nor barred by the

general merger clause contained in the contract.") (internal citations omitted).  As

E*Trade contends, *Cohen* is on point and the allegedly fraudulent representations made

by Holdings prior to entering into the Merger Agreement were extraneous and apart from

the representations in the contract itself.

    In *DynCorp*, the Court distinguished cases such as *Cohen* by finding that the

agreements at issue there did not contain a clause that precluded reliance on pre-

contractual representations, or representations that were extraneous or collateral to the

representations provided by the contract.  215 F.Supp.2d at 326.  Nevertheless, as

discussed above, the clause in the instant case provided that the contractual remedies

were exclusive only "for the subject matter concerned by such indemnification and any

claim arising under this agreement."  The "exclusive remedy" clause did not expressly

apply to any claim "relating to" the Agreement or "relating to" the subject matter of the

Agreement.  It is critical that the fraud that E*Trade has alleged goes beyond the specific

representations in the Agreement.  Moreover, as the discussion in *Tomoka* recognizes, a

duty independent of the contract will be recognized "where one party possesses superior

29

knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." *Tomoka*, 2004 W.L. 1118178 at *4. The instant case thus falls generally within the third of the *Tomoka* categories.

In sum, the fraud claims asserted by E*Trade are not duplicative of its contract claims and will not be dismissed on that basis.

### B. The Sufficiency of Holdings' Fraud Causes of Action

Like E*Trade, Holdings has alleged causes of action sounding in securities law and common law fraud, the sufficiency of which is contested. There is no dispute that Holdings has sufficiently alleged the scienter, "in connection with" and "use of the mails or any facility of a national securities exchange" elements. The elements in dispute with respect to both causes of action are materiality, reliance and injury. The issue whether the fraud claims are duplicative of the contract claims arises here as well.

### 1. Materiality

Whether a misrepresentation or omission is material is a mixed question of law and fact. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b-5 by "alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Ganino*, 228 F.3d at 161, citing *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988). A substantial likelihood must exist that "the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id*. at 161, citing *Basic Inc.*, 485 U.S. at 231-32. While it is not sufficient to allege that the investor might have considered the misrepresentation or omission important, it is not necessary to assert that the investor

would have acted differently if an accurate disclosure had been made. *Ganino*, 228 F.3d at 161. An omitted fact may be immaterial if the information is so basic or trivial that any investor might be expected to know it. *Id*. at 161, citing *Basic Inc.*, 485 U.S. at 231 and *Levitin v. PaineWebber, Inc.*, 159 F.3d 698, 702 (2d Cir. 1998), *cert. denied*, 525 U.S. 1144 (1999). However, the Second Circuit has held that on a Rule 12(b)(6) motion, "a complaint may not properly be dismissed ... on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino*, 228 F.3d at 161; *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985).

E*Trade attacks each of the alleged misrepresentations and omissions on which Holdings relies as immaterial and unimportant, and each will be considered in turn.

*(i) Value of E*Trade stock and Earnings Projection*

E*Trade allegedly made three representations regarding the value of its stock. The first representation was that E*Trade stock had the "best and most attractive currency" offered by potential acquirers. The second is that E*Trade stock would trade at $12/share by September 2002 and $20/share by December 2002, and the third is that E*Trade would report $1/share in earnings by the end of 2002. E*Trade argues that, taken alone, the statements should be viewed as mere puffery, not concrete representations. The Counterclaims allege that the representations, taken together and along with the other representations discussed below, induced Holdings to permit E*Trade to participate in the auction process and ultimately acquire the Tradescape subsidiaries.

31

It is well accepted that even if statements that are "mere 'puffery' or opinions as to future events" cannot form the basis of a fraud claim, a "relatively concrete representation as to a company's future performance, if made at a time when the speaker knows that the represented level of performance cannot be achieved, may ground a claim in fraud." *Cohen*, 25 F.3d at 1172. In *Cohen*, the Second Circuit held that a representation that net income would exceed a certain level was actionable even though it concerned future performance, because the statement was repeated at a time the defendant knew the represented level could not be achieved in light of the actual performance to date. Other courts have similarly held that a representation that a company "expects to exceed the revenue and profit forecast" is potentially actionable in a securities fraud context. *Marx v. Computer Sciences Corp.*, 507 F.2d 485, 488-90 (9th Cir. 1974); *see also Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 164 (2d Cir. 1980) ("Liability may follow where management intentionally fosters a mistaken belief concerning a material fact, such as its evaluation of the company's progress and earnings prospects in the current year.").

Under *Cohen* and *Marx*, the representation that E*Trade would report certain earnings by the end of 2002 is actionable, if false and made at a time E*Trade had reason to know that the predicted results could not be achieved. This allegation will not be dismissed on grounds that the representation was immaterial as a matter of law. No authority, however, has been cited for the proposition that a representation as to the future trading price of stock can be actionable. E*Trade could not control the trading price of its own stock and predictions of its stock price cannot under the circumstances here reasonably form the basis for a fraud action. Moreover, the assertion that E*Trade stock

is the "best and most attractive currency" is obviously mere opinion. There is sufficient pleading of the element of materiality only as to the earnings that E*Trade would report by the end of 2002.

### (ii) The business strategy of E*Trade

Holdings alleges that "E*Trade repeatedly represented to Holdings between December 2001 and April 2002, prior to the merger, that it was engaged in the process of 'rolling up' the active trading industry (buying up small brokerage firms which specialized in providing access to active traders), and that after buying [the Tradescape Entities], it would continue to 'roll up' (consolidate) the active trading industry." (Holdings' Counterclaims, ¶ 18.) A representation of this nature can be actionable as a statement "supported by specific statements of fact." *IBM Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998) (citations omitted); *Cyber Media Group, Inc. v. Island Mortgage Network, Inc.*, 183 F.Supp.2d 559, 572 (E.D.N.Y. 2002). The Counterclaims, however, have not adequately pleaded these claims under Rule 9(b) standards, in that Holdings does not provide allegations that are specific enough under the circumstances. The lack of specificity of these allegations is highlighted when compared to the representations discussed above, where specific speakers are named and locations are provided (see Counterclaims, ¶¶ 15-17.) These alleged misrepresentations are therefore dismissed on the ground of failure to plead with particularity.

### (iii) E*Trade's willingness and intent to pay an earn-out of additional E*Trade stock after the merger

As illustrated by *Cohen*, the "failure to fulfill a promise to perform future acts is not ground for a fraud action unless there existed an intent not to perform at the time the promise was made." 25 F.3d at 1172 (citation omitted). Nevertheless, Holdings has

sufficiently alleged facts to support its contention that at the time E*Trade entered into

the Merger Agreement, it never intended to pay the Earn Out and instead intended to

frustrate Holdings' ability to achieve it.  Obviously, since Holdings asserts a failure to

disclose, the allegations of date and place need not be specific.[14]

### (iv) The post-merger role of Holdings' CEO

Holdings alleges that E*Trade represented that "[Holdings'] CEO, Omar Amanat,

would have full operational control over the Momentum business, as well as additional

necessary resources and capital, and would eventually run E*Trade's entire retail

brokerage business."  (Counterclaims, ¶ 13(d).)  It is claimed that this representation was

false.  The specific facts cited in the Counterclaims do not, however, support this

allegation.  (See Counterclaims, ¶¶ 14, 48-49.)  There is no specificity to the allegation

that E*Trade represented that Amanat would have full operational control over the

Momentum business, or that he would have additional necessary resources and capital or

that he would eventually run E*Trade's entire retail brokerage.  These allegations are

therefore dismissed.  *See D'Alessio*, 258 F.3d at 99, citing *Burnette*, 192 F.3d at 56.

### (v) Failure to disclose Cotsakos' $90 million compensation

Holdings alleges that during the negotiations leading to E*Trade's purchase of

Holdings with E*Trade stock, E*Trade failed to disclose to Holdings that E*Trade had

paid its CEO, Christos Cotsakos, nearly $90 million in compensation in 2001 and had

made substantial loans and other payments to Cotsakos as well.  (Counterclaims, ¶ 25.)

Holdings alleges that E*Trade had a duty to disclose this material information to

---

[14] Holdings alleges that "[i]ndicative of its true intent, [E*Trade] announced, immediately after entering
into the Merger Agreement, that it had purchased [the Tradescape Entities] for a purchase price of $100
million, and that the possibility that it would pay more through the earn-out was based on "aggressive
earnings targets."  (Counterclaims, ¶ 53.)  Although this statement, taken alone, does not prove very much,
it may ultimately support the contention of intent not to perform at the time the promise was made.

Holdings prior to the signing of the Merger Agreement, in that disclosure of the size of

Cotsakos' compensation would be important to a reasonable investor and would have

altered the "total mix" of information available as to the value of E*Trade's shares, thus

making the disclosure material.

E*Trade argues that Holdings' claims of fraud with respect to this omission

cannot stand because the compensation of E*Trade's former CEO was disclosed.

E*Trade relies on various public disclosures, references in a derivative class action suit

described by E*Trade in its 2001 Form 10-K and widespread media coverage, prior to the

execution of the Merger Agreement and certainly prior to the closing of the transaction.

It may be that E*Trade can establish at trial that the disclosures available should have

been sufficient to provide Holdings with adequate information.  However, even the table

provided in E*Trade's reply memorandum of law, which breaks up the different aspects

of Cotsakos' compensation by listing an amount and the pre-merger SEC disclosure

documents from which the amount can be extracted, does not evidence disclosure of an

aggregate of $90 million in compensation.  In any event, even assuming *arguendo* that

the Court can take notice of all those documents on a motion to dismiss, the issue cannot

be tried on such a motion.  This is particularly true because, as Holdings stresses, the

market allegedly had a strong negative reaction to full and complete disclosure of

Cotsakos' total compensation, which allegedly caused E*Trade's stock price to drop from

$9.05 per share on April 30, 2002, to $2.80 per share by January 2003, when Cotsakos

was forced to retire.  Although E*Trade makes a strong effort to demonstrate from

multiple documents and sources that "all of" the facts were available, no such finding can

be made at this stage, and the allegations of the counterclaims are sufficient to meet the
materiality standard.

> *(vi) E\*Trade's failure to disclose losses of over $270 million in the first quarter of 2002*

Holdings alleges that shortly after disclosing the full extent of Cotsakos'
compensation, E\*Trade announced – and Holdings learned for the first time – that
E\*Trade had losses of over $270 million in the first quarter of 2002.  (Counterclaims, ¶
27.)  However, in its response to E\*Trade's motion to dismiss, Holdings concedes that
"the failure to disclose that loss is not the basis of [Holdings'] claim."  (See
Counterclaims, ¶ 29 and Mem. in Opposition to E\*Trade's Motion to Dismiss at 21.)
This alleged non-disclosure is thus not a separate claim in the litigation. *See Manela*, 5 F.
Supp. 2d at 178, n.118, citing *Remington Rand Corp.*, 68 F.3d at 1483.

In sum, Holdings' allegations of misrepresentations and omissions as to the
earnings projection, the earn-out and Cotsakos' compensation is sufficiently pleaded with
respect to the element of materiality.

### 2. Reliance

As Holdings argued with respect to E\*Trade's allegations of fraud, E\*Trade
contends that Holdings' claims of fraud in connection with the Merger Agreement are
barred by the integration clause in the Agreement.  E\*Trade's representations in the
Agreement are few and non-specific, which cuts against this argument, but, as discussed
above, the integration clause at issue here would seem to be sufficiently specific to bar
Holdings from complaining about the oral representations allegedly made by E\*Trade to
Holdings, unless Holdings can show that the "peculiar knowledge" exception applies.
*See Dimon Inc.*, 48 F. Supp. 2d at 368.  The two factors to analyze are Holdings' level of

36

sophistication and its access to the information underlying the alleged misrepresentations. *Id*. at 368.

With respect to the first factor, Holdings would be considered a sophisticated business entity, which hired experienced advisors to assist it in the sale of Momentum. (Counterclaims, ¶ 14.) However, as to level of access to the omitted information, the alleged misrepresentations were within the "peculiar knowledge" of E*Trade and Holdings had no practical means of learning the true facts except from E*Trade.  For similar reasons to those discussed above with respect to E*Trade's claims, for pleading purposes, the facts allegedly misrepresented were sufficiently within the exclusive knowledge of E*Trade so that the integration clause cannot be said to preclude Holdings from having reasonably relied on representations or failures to disclose made outside of the Merger Agreement.

### 3. Injury

To state a *prima facie* case of fraud, a plaintiff must allege two types of causation: "loss causation—that the misrepresentations or omissions caused the economic harm— and transaction causation—that the violations in question caused the [plaintiff] to engage in the transaction in question."  *Citibank, N.A.*, 968 F.2d at 1494, citing *Bennett v. United States Trust Co. of New York*, 770 F.2d 308, 313 (2d Cir. 1985), *cert. denied*, 474 U.S. 1058 (1986); *see also Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 967 F.2d 742, 747 (2d Cir. 1992).  Under New York law, an "injury is proximately caused if it is the natural and probable consequence of the defrauder's misrepresentation or if the defrauder ought reasonably to have foreseen that the injury was a probable consequence of his fraud."  *Citibank, N.A.*, 968 F.2d at 1496, citing *Cumberland Oil Corp. v. Thropp*, 791

F.2d 1037, 1044 (2d Cir. 1986), *cert. denied*, 479 U.S. 950 (1986). The Second Circuit

has "on occasion likened loss causation to the tort concept of proximate cause ... because

similar to proximate cause, in order to establish loss causation, a plaintiff must prove that

the damage suffered was a foreseeable consequence of the misrepresentation." *Citibank,*

*N.A.*, 968 F.2d at 1495 (omitting internal citation); *see also Litton Indus., Inc.*, 967 F.2d

at 747 ("The causation analysis encompasses two related, yet distinct elements-reliance

and causation-elements that, in effect, correspond respectively with common law notions

of 'but for' and proximate causation.").  To demonstrate injury from fraud, a party must

show actual pecuniary loss.  *Rosen v. Spanierman*, 894 F.2d 28, 34 (2d Cir. 1990).

There is no question that Holdings has adequately pleaded loss causation by

alleging damages as a direct and proximate result of E*Trade's fraud.  E*Trade argues,

however, that a termination clause in the Merger Agreement (the "Termination Clause")

precludes Holdings from contending that Holdings was injured by E*Trade's failure to

disclose Cotsakos' compensation, because the information was unquestionably disclosed

before the date the merger closed.  The Termination Clause, in relevant part, provided as

follows:

> This Agreement may be terminated, and the transactions contemplated
> hereby may be abandoned, at any time prior to the Effective Time: * * * *
> (d) by the Company [Holdings] if the Parent [E*Trade] shall breach any of
> its representations, warranties or obligations hereunder to the extent that
> would cause the condition set forth in Section 8.2(a) not to be satisfied ... .

(Merger Agreement, § 10.1.)  Section 8.2 of the Merger Agreement, in turn, provided:

> The obligation of the Company [Holdings] and the Target Companies [the
> Tradescape Entities] to effect the Mergers and the other transactions
> contemplated by this Agreement is subject to the fulfillment at or prior to
> the Closing of each of the following conditions (all of which may be
> waived by the Company in its sole discretion).

> (a) Parent [E*Trade] and Merger Subs shall have performed and complied
> with all covenants and agreements contained in this Agreement that are
> required to be performed or complied with by them prior to or at the
> Closing and each of the representations and warranties of Parent contained
> in this Agreement shall be true and correct, in all material respects (if not
> qualified by materiality) and in all respects (if qualified by materiality) as
> of the Closing Date as though made on and as of the Closing Date or, in
> the case of representations and warranties made as of a specified date
> earlier than the Closing Date, shall have been true and correct in all
> material respects (if not qualified by materiality) and in all respects (if
> qualified by materiality) on and as of such date and Parent shall have
> delivered to the Company a certificate dated the Closing Date executed on
> behalf of Parent by an authorized signatory to such effect ... ."

Assuming there was an actionable omission, E*Trade interprets this clause to have
allowed Holdings to terminate the Merger Agreement in the event that E*Trade made a
material misrepresentation or omission in its SEC filings and was in breach of the Merger
Agreement prior to the closing of the transaction.

It is not entirely clear, on these motions to dismiss, that Holdings could have
terminated the Merger Agreement without liability by application of the express terms of
the agreement.  E*Trade made hardly any representations.  The sole representation that
E*Trade cites as giving Holdings the right to terminate was the representation that none
of E*Trade's SEC filings contained any untrue statement or material omission.  This
representation, however, had an exception—"except to the extent corrected by a
subsequently filed" SEC document.[15]  Based on the final clause, an untrue SEC filing by
E*Trade arguably would not breach the Merger Agreement if E*Trade corrected it with a
subsequent filing before the closing of the transaction, and E*Trade would not have been
in breach of the Merger Agreement.  For purposes of this motion to dismiss, taking all

---

[15] Section 3.4 of the Merger Agreement represented that none of E*Trade's publicly available SEC filings
contained "any untrue statement of a material fact or omitted to state a material fact required to be stated
therein or necessary to make the statements made therein, in light of the circumstances in which they were
made, not misleading, *except to the extent corrected by a subsequently filed*" SEC document. (emphasis
added)

inferences in Holdings favor, it cannot be said as a matter of law that Holdings cannot prove loss causation.[16]

### 4. Whether Holdings' Fraud Claims are Duplicative of its Breach of Contract Claims

Finally, E*Trade contends that Holdings' fraud claims must be dismissed as merely duplicative of its contract claims. This issue must be subjected to the same *Bridgestone/Firestone* analysis discussed above. Holdings does not make a serious effort to satisfy the first two *Bridgestone/Firestone* factors, namely the demonstration of (i) a legal duty separate from the duty to perform under the contract and (ii) a fraudulent misrepresentation collateral or extraneous to the contract. Holdings asserts that it nevertheless should be able to pursue a fraud claim because it meets the third criterion, in that it is seeking special damages that were caused by E*Trade's misrepresentations and that are not recoverable as contract damages. *See Bridgestone/Firestone, Inc.*, 98 F.3d at 20, citing *Deerfield Communications Corp.*, 68 N.Y.2d at 956, 510 N.Y.S.2d at 89, 502 N.E.2d at 1004, and *Triumph Adver. Prods.*, 116 A.D.2d at 527-28, 497 N.Y.S.2d at 675. Special damages, in the context of commercial fraud, "arise in consequence of a breach and seek to compensate a plaintiff for losses other than the diminished value of the promised performance." *DynCorp*, 215 F. Supp. 2d at 327, citing *Bibeault v. Advanced*

---

[16] Holdings further argues that it was forced to close the transaction because, as E*Trade knew, Holdings was experiencing financial difficulties and liquidity problems and had lost the opportunity to sell to others by that point. (Counterclaims, ¶¶ 36-38.) Holdings argues that it was in effect under economic duress imposed by E*Trade. The elements of economic duress are (i) a threat, (ii) unlawfully made, (iii) that caused involuntary acceptance of contract terms, (iv) because the circumstances permitted no other alternative. *See Kamerman v. Steinberg*, 891 F.2d 424, 431 (2d Cir. 1989). Holdings cites three cases that it asserts are on point and demonstrate that it had to close in light of economic duress inflicted upon it by E*Trade: *Weinraub v. Int'l Banknote Co.*, 422 F. Supp. 856, 860 (S.D.N.Y. 1976), *Sedona Corp. v. Ladenburg Thalmann & Co., Inc.*, 2005 WL 1902780, at *6 (S.D.N.Y. Aug. 9, 2005), and *Kiska Constr. Corp.-USA v. G&G Steel, Inc.*, 2005 WL 1225944, at *4-5 (S.D.N.Y. May 20, 2005). But none of these cases is on point. In fact, Holdings does not mention the term "economic duress" once in its Counterclaims, nor does it plead the elements of economic duress directly or adequately.

*Health Corp.*, 2002 WL 24305, at \*6 (S.D.N.Y. Jan. 8, 2002) (citing New York cases). The circumstances giving rise to such damages "must reasonably be anticipated at the times the contract was made."  *Id.*

Holdings maintains that it is seeking special damages based on the loss of an opportunity to make a deal that would have resulted in another company's acquisition of the Tradescape Entities.  It cites *Rosen*, 894 F.2d at 34-35 (2d Cir. 1990), for the proposition that it would have sold the Tradescape Entities to other companies such as Ameritrade or Schwab if it had not been fraudulently induced by E\*Trade to enter into the Merger Agreement.  The Court in *Rosen* held that the opportunity to buy a picture believed to be worth at least $15,000 was a "spendable asset," that the purchasers could "have chosen to acquire a painting in another gallery, or something entirely different," and that if the representations made by the seller had been true, the purchasers "would now own a painting worth approximately $200,000."  894 F.2d at 34-35.  The Court concluded  that on "these facts, to hold that the [purchasers] have not suffered injury would defy logic."  *Id.* at 35.

 E\*Trade responds, citing *Lama Holding Co. v. Smith Barney, Inc.*, 88 N.Y.2d 413, 422, 668 N.E.2d 1370, 1373, 646 N.Y.S.2d 76, 80 (1996), that the loss of an alternative contractual bargain cannot serve as a basis for fraud or misrepresentation damages.  This general rule, however, is tempered by the conclusions of several courts, including the *Lama* court, that the rule comes into play only when the existence of the alternative contractual bargain is undeterminable and speculative.  *See id.* at 422 (because there was never a concrete alternative bargain on the table, the loss of the bargain was "undeterminable and speculative"); see also *Dress Shirt Sales, Inc. v. Hotel Martinique*

*Assocs.*, 12 N.Y.2d 339, 190 N.E.2d 10, 239 N.Y.S.2d 660 (1963) (finding that the very

existence of an alternative sublessee was undeterminable and speculative).  Holdings

asserts that there were several other parties to whom it could have sold the Tradescape

entities, and the facts alleged are specific enough to avoid the conclusion that an

alternative contractual bargain was speculative or undeterminable.  (Counterclaims, ¶ 10-

11.)  Special damages have been adequately pleaded, and the fraud claims are not

precluded by the *Bridgestone/Firestone* doctrine.

### 5.  Sanctions

On January 17, 2006, E*Trade also filed a motion for sanctions against Holdings

pursuant to Fed. R. Civ. P. 11, made applicable by Bankruptcy Rule 9011.  The motion

asserts that Holdings failed to satisfy its duty of reasonable inquiry with respect to the

fraud claims and instead had included, in both its Counterclaims and opposition to

E*Trade's motion to dismiss, allegations and factual contentions that lack any evidentiary

support whatsoever.  Based on the other conclusions in this opinion, Holdings' claims are

not frivolous and the motion for sanctions is denied. *See Baker v. Latham Sparrowbrush*

*Associates (In re Cohoes Indust. Terminal, Inc.)*, 931 F.2d 222, 227 (2d Cir. 1991)

(citations omitted).

## II. Holdings' Conversion Claim

E*Trade further asserts that Holdings' eighth cause of action for conversion

should be dismissed because it merely duplicates Holdings' fifth cause of action for

breach of contract.  The fifth cause of action for breach of contract alleges, in relevant

part, that "Under Section 3.2 of the September 13, 2002 Agreement, E*Trade had an

obligation to return [Holdings'] hardware and software 'as soon as reasonably practicable

following the Closing date (but no later than 5:00 p.m., Friday, September 20th, 2002)." E*Trade did not deliver the necessary equipment and software on September 20. Instead, E*Trade intentionally deprived Holdings of access to the hardware and software for as long as possible." (Counterclaims, ¶ 99.) This is similar to the allegation, made as a conversion claim in the eighth cause of action, that Holdings "was the legal owner of various pieces of hardware, software and equipment housed in a data center that was supposed to be shared by E*Trade and Holdings after the merger. E*Trade intentionally exercised dominion and control over, and improperly denied [Holdings] of the use of this property." (Counterclaims, ¶ 117.)

Under New York law, the "tort of conversion is established when one who owns and has a right to possession of personal property proves that the property is in the unauthorized possession of another who has acted to exclude the rights of the owner." *Rella v. N. Atl. Marine, Ltd.*, 2004 WL 1418021, at *5 (S.D.N.Y. June 23, 2004), quoting *Republic of Haiti v. Duvalier*, 626 N.Y.S.2d 472, 475 (1st Dep't 1995). However, a conversion claim that "merely duplicates a breach of contract claim is not actionable." *Wechsler v. Hunt Health Sys., Ltd.*, 330 F. Supp. 2d 383 (S.D.N.Y. 2004).

For a conversion claim to succeed in the context of a dispute regarding a contract, "the breach of contract must result in some 'wrong' that is separately actionable." *Rella*, 2004 WL 1418021, at *5, quoting *Briarpatch Ltd. L.P. v. Geisler Roberdeau, Inc.*, 148 F. Supp. 2d 321, 328 (S.D.N.Y. 2001), *aff'd in part and vacated in part on other grounds*, 373 F.3d 296 (2d Cir. 2004), *cert. denied*, 544 U.S. 949 (2005); *see also Elma RT v. Landesmann Int'l Mktg. Corp.*, 2000 WL 297197, at *3 (S.D.N.Y. March 22, 2000), citing *New York Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 316, 662 N.E.2d 763,767-68,

639 N.Y.S.2d 283, 287-88 (1995). There is an exception in that "separate tort claims may be maintained where they rest upon a 'legal duty independent of the contract itself.'" *Pandisc Music Corp. v. Red Distribution, LLC*, 2005 WL 646216, at *1 (S.D.N.Y. March 18, 2005), quoting *Spanierman Gallery, PSP v. Love*, 2003 WL 22480055, at *3 (S.D.N.Y. Oct. 31, 2003). To determine whether an action for conversion (or any other tort) exists in addition to an action for breach of contract, or whether there is an independent legal duty, a court "must first ask whether the alleged obligation to do or not to do something that was breached could not have existed but for a manifested intent. In other words, the Court must determine whether defendants had a duty separate from any duties imposed by defendants' contractual obligations. If no such duty exists, then contract is the only theory upon which liability can rest." *Elma RT*, 2000 WL 297197, at *4 (citations omitted).

In this case, E*Trade's duty to return or permit Holdings to use property which E*Trade had acquired pursuant to the Merger Agreement arose from the Merger Agreement. Holdings has not articulated any other source for this obligation, and none is apparent from the face of the Complaint and Counterclaims. Accordingly, the conversion claim should be dismissed as duplicative of the contract claim. Moreover, where a plaintiff does not seek to have the defendant return property, but seeks only damages for the conversion in an amount equal to the amount sought for breach of contract, the remedy for the proposed conversion claim merely duplicates the contract remedy already sought, and the former claim is not warranted. *See Briarpatch Ltd. L.P.*, 148 F. Supp. 2d at 329; *see also New York Racing Assoc., Inc. v. Meganews, Inc.*, 2000 WL 307378, at *5 (E.D.N.Y. Mar. 21, 2000) (holding that a conversion claim was duplicative in part

because "it seeks the same damages as are claimed in the contract claim.").  Holdings

argues that the damages sought are not duplicative because the contract damages cover

the conversion damages (value of the property wrongfully taken) and *more* than that,

namely damages incurred from E*Trade's failure to post a letter of credit to guarantee

payment of a lease.  (Counterclaims, ¶ 98.)  However, Holdings has not explained why

the conversion damages are not included within those sought for breach of contract, and

the remedies are duplicative.  The conversion claim must be dismissed.

**III. Holdings' Request for Punitive Damages**

Holdings has appended to its other claims a demand for punitive damages.  Under

New York law, two elements must be alleged to recover punitive damages: (i) "gross,

wanton, or willful fraud or other morally culpable conduct" to a degree sufficient to

justify an award of punitive damages, *see Shanahan v. Vallat*, 2004 WL 2937805, at *11

(S.D.N.Y. Dec. 19, 2004) (omitting citation); and (ii) fraud aimed at the public generally.

*Rocanova v. Equitable Life Assurance Soc'y of the United States*, 83 N.Y.2d 603, 613,

634 N.E.2d 940, 943, 612 N.Y.S.2d 339, 342 (1994).  Under New York law, punitive

damages are not available in "the ordinary fraud and deceit case." *Shanahan*, 2004 WL

2937805, at *11, citing *Walker v. Sheldon*, 10 N.Y.2d 401, 405, 223 N.Y.S.2d 488, 499

(1961).  However, although the need for punitive damages

> as a deterrent is more apparent in the case of 'those who deliberately and
> cooly engage in a far-flung fraudulent scheme, systematically conducted
> for profit' than when the conduct involves a single transaction, such
> damages have been awarded for a single act of wrongdoing.  The test is
> not the number of wrongful acts but whether the conduct is sufficiently
> willful and egregious to indicate a need for something more than
> compensatory relief.

45

*Whitney v. Citibank, N.A.*, 782 F.2d 1106, 1118 (2d Cir. 1986) (internal citations

omitted).

The second element, namely that the fraud must be aimed at the public generally,

was emphasized in *Rocanova*.  In *Rocanova*, the New York Court of Appeals held that

punitive damages

> are not recoverable for an ordinary breach of contract as their purpose is
> not to remedy private wrongs but to vindicate public rights.  However,
> where the breach of contract also involves a fraud evincing a 'high degree
> of moral turpitude' and demonstrating 'such wanton dishonesty as to
> imply a criminal indifference to civil obligations', punitive damages are
> recoverable if the conduct was 'aimed at the public generally.'  Punitive
> damages are available where the conduct constituting, accompanying, or
> associated with the breach of contract is first actionable as an independent
> tort for which compensatory damages are ordinarily available, and is
> sufficiently egregious ... to warrant the additional imposition of exemplary
> damages.  Thus, a private party seeking to recover punitive damages must
> not only demonstrate egregious tortious conduct by which he or she was
> aggrieved, but also that such conduct was part of a pattern of similar
> conduct directed at the public generally.

83 N.Y.2d at 613, 634 N.E.2d at 943-44, 612 N.Y.S.2d at 342-43.  Construing

*Rocanova* in *New York Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 662 N.E.2d 763,

639 N.Y.S.2d 283 (1995), the New York Court of Appeals recounted the pleading

elements required to state a claim for punitive damages when the claim involves

breach of a contract, as follows: "(1) defendant's conduct must be actionable as an

independent tort; (2) the tortious conduct must be of the egregious nature set forth

in *Walker v. Sheldon*; (3) the egregious conduct must be directed to plaintiff; and

(4) it must be part of a pattern directed at the public generally."  (omitting internal

citations).  In analyzing the first element, the Court said that where a lawsuit has

"its genesis in the contractual relationship between the parties, the threshold task

for a court considering defendant's motion to dismiss a cause of action for

punitive damages is to identify a tort independent of the contract." *Id.* at 316.

The Court then added that where "a party has fraudulently induced the plaintiff to

enter into a contract, it may be liable for tort." *Id.* at 316.

Prior to *Rocanova*, several Second Circuit opinions had relied on *Borkowski v.*

*Borkowski*, 39 N.Y.2d 982, 983, 387 N.Y.S.2d 233, 355 N.E.2d 287 (1976), for the

proposition that it is "not essential" that "punitive damages be allowed in a fraud case

only where the acts had been aimed at the public generally." *See, e.g.*, *Whitney*, 782 F.2d

at 1118. However, as the Court in *W.S.A., Inc. v. ACA Corp.* held, "*Borkowski* was

decided almost two decades before *Rocanova*" and "to the extent that they are in conflict,

familiar principles compel the result suggested by *Rocanova*." 1998 WL 635536, at *2

(S.D.N.Y. Sept. 15, 1998). In "the wake of *Rocanova*, the lower New York appellate

courts have consistently applied the 'public wrong' rule to tort and contract cases alike."

*W.S.A., Inc.*, 1998 WL 635536, at *2 (citing cases); see also *Merrill Lynch & Co., Inc. v.*

*Allegheny Energy, Inc.*, 382 F. Supp. 2d 411, 422-23 (S.D.N.Y. 2003).

Holdings has failed to plead conduct aimed at the general public. The New York

cases, to which Holdings cites for the proposition that punitive damages on a fraud claim

do not require a showing that the conduct was directed at the public generally, either (i)

involve breaches of fiduciary duty, which do not have their genesis in a contractual

relationship; (ii) cite to *Giblin v. Murphy*, 73 N.Y.2d 769, 532 N.E.2d 1282, 536

N.Y.S.2d 54 (1988), which was decided prior to *Rocanova*; or (iii) do not discuss

*Rocanova* and its progeny at all. *See Pirrotti & Pirrotti, LLP v. Warm*, 8 A.D.3d 545,

778 N.Y.S.2d 705 (2d Dep't 2004); *Auguston v. Spry*, 282 A.D.2d 489, 723 N.Y.S.2d 103

(2d Dep't 2001); *Sherry Assocs. v. Sherry-Netherland, Inc.*, 273 A.D.2d 14, 708

N.Y.S.2d 105 (1st Dep't 2000); *H.B. Int'l, Ltd. v. Kahan Jewelry Corp.*, 266 A.D.2d 77,

700 N.Y.S.2d 671 (1st Dep't 1999).  As those cases are distinguishable, based on

*Rocanova*, Holdings' request for punitive damages is dismissed.

## CONCLUSION

Holdings' motion to dismiss E*Trade's fraud claims is denied.  E*Trade's motion

to dismiss Holdings' fraud counterclaims is granted only with respect to the claims

involving (i) E*Trade's alleged representations regarding the value of stock and the

attractiveness of its stock as consideration; (ii) E*Trade's business strategy; (iii) the post-

merger role of Holdings' CEO; and (to the extent it is part of the counterclaims) (iv)

E*Trade's non-disclosure of $270 million in losses.  E*Trade's motion to dismiss the

fraud claims is otherwise denied.  E*Trade's motion to dismiss the eighth cause of action

(counterclaim) for conversion is granted; its motion for Rule 11 sanctions is denied.  The

Debtor is directed to settle an order on five days' notice and to set the matter down for a

pretrial conference as well as a hearing on any other pending motions.

Dated: New York, New York
        September 29, 2006

         _/s/ Allan L. Gropper_____ _____
        UNITED STATES BANKRUPTCY JUDGE